The VILLAGE OF WINNETKA,
ILLINOIS, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

City of Rochelle, Illinois,
Commonwealth Edison Company,
Intervenors.

No. 81–1889.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 1982.

Decided May 18, 1982.

As Amended May 18, 1982.

Marvin S. Lieberman, Washington, D. C., with whom Charles J. Simpson, Jr., Washington, D. C., was on the brief, for petitioner.

Robert F. Shapiro, Atty., Washington, D. C., with whom Charles A. Moore, Gen.

Counsel, and Jerome M. Feit, Sol., and Auburn L. Mitchell, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.

Clark Evans Downs, Washington, D. C., with whom Frederick C. Williams, Washington, D. C., was on the brief, for intervenor Commonwealth Edison Company.

Charles F. Wheatley, Jr., Washington, D. C., and Woodrow D. Wollesen, Washington, D. C., were on the brief, for intervenor City of Rochelle, Illinois.

Before TAMM and GINSBURG, Circuit Judges, and EDMUND L. PALMIERI,* Senior United States District Judge for the Southern District of New York.

Opinion PER CURIAM.

PER CURIAM:

## I.

The Village of Winnetka, a North Shore suburb of Chicago, operates its own electric utility. From 1972 until June 6, 1979, it purchased large quantities of economy energy[1] from Commonwealth Edison (Comm Ed), the major electric utility serving the Chicago metropolitan area. Winnetka made these purchases because it found them less costly than producing equivalent amounts of energy in its municipal power plant.[2] Under the 1972–1979 arrangement, Comm Ed would make economy energy available to Winnetka except during periods when Comm Ed's highest-cost generating units were in operation. Comm Ed would notify Winnetka daily at 5 a. m. of the projected time periods during which economy energy would be available in the ensuing twenty-four hours.

On June 6, 1979, Comm Ed unilaterally changed the conditions governing economy energy sales.[3] It now makes such power available only during hours when none of its oil-fired generators is in use and notifies Winnetka twice daily concerning economy energy availability during the ensuing twelve-hour period.

Comm Ed's tariff (Rate 78) on file with the Federal Energy Regulatory Commission (FERC) contains only a brief reference to economy energy sales. Paragraph 3(C) of the tariff provides, in relevant part, that such sales are

purchases of energy on a daily basis arranged at least four hours in advance of the time such purchases beg[i]n, provided that such purchases may be terminated by [Comm Ed's] load dispatcher when, in his absolute discretion, system conditions justify such termination (i) on two hours' notice if such termination is to occur [at off-peak times] and (ii) on ten minutes' notice at any other time.

App. 64.

Contending that the seven-year course of performance ending June 6, 1979, entailed "practices" that should have been included in Rate 78 under the terms of section 205(c) of the Federal Power Act, 16 U.S.C. § 824d(c), Winnetka filed an administrative complaint with the FERC. The municipality sought to compel Comm Ed to amend Rate 78 to include the 1972–1979 approach to economy energy sales, not to depart from this approach without prior FERC approval, and to refund the additional charges Winnetka had paid under the more restrictive conditions.[4] The City of Rochelle, which operates the only other municipal utility purchasing economy energy as a partial re-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. Economy energy transactions are sales in which the purchaser pays only an "energy charge" (*i.e.*, an amount intended to cover the utility's costs of generating electricity), but not a "demand charge" (*i.e.*, an amount intended to cover the generating utility's capital costs).

2. In addition to economy energy purchases, Winnetka supplements the production of its

municipal plant by purchasing electricity on a firm basis from Comm Ed.

3. Comm Ed further restricted these conditions on October 18, 1979.

4. Winnetka contended that Comm Ed's changes had reduced the availability of economy energy from a 1975–1979 average of 16.96 hours daily to a 1979–1980 average of 2.52 hours daily, resulting in significant increases in Winnetka's electric power costs.

quirements customer of Comm Ed, intervened in support of Winnetka. In addition to endorsing Winnetka's position, Rochelle complained that Comm Ed's 1979 changes in economy energy sales conditions were anticompetitive.

On April 10, 1981, the FERC granted Comm Ed's motion for summary disposition of Winnetka's complaint. The three-page order contained one paragraph of substantive discussion:

> We here uphold Edison. Absent other express limitations, the language of Electric Rate Tariff 78 provides Edison with sole authority to set and implement criteria for determining the availability of economy energy, to arrange for sales of that energy, and to determine whether and when such sales will be terminated.

App. 47.

Two commissioners filed concurring statements. Commissioner Hall noted that the FERC had required utilities to include "practices" in their tariffs only on a case-by-case basis and that, on balance, there was no need to compel Comm Ed to include its policies with respect to economy energy in Rate 78. He noted, however, that he would welcome a voluntary filing by Comm Ed in accordance with the utility's offer to make such a submission. App. 49–50.

Commissioner Hughes defined two separate tariff interpretation issues: arrangements for economy energy service, and termination practices. As to arrangements for service, he concluded that Comm Ed's changes in the criteria for economy energy sales fell within the area of discretion Rate 78 reserved to Comm Ed. Concerning termination practices, although he found the question closer, Commissioner Hughes read the phrase "when system conditions justify" to include both economic and operational conditions.[5] He cautioned, however, that "[a] complaint would perhaps lie for arbitrary, discriminatory or anticompetitive [conduct in arranging for or terminating economy energy availability], but Winnetka's complaint is not so grounded."[6] App. 51–52.

Winnetka made a timely application for rehearing, App. 53–59, which the Commission effectively denied by taking no action within thirty days, see 16 U.S.C. § 825l(a); 18 C.F.R. § 1.34(c) (1981). This petition for review followed.

## II.

Winnetka contends that the standards by which Comm Ed determined the availability of economy energy and the notification system it used during the 1972–1979 period were "practices" within the meaning of section 205(c) of the Federal Power Act, 16 U.S.C. § 824d(c). Section 205(c) provides in relevant part:

> Under such rules and regulations as the [FERC] may prescribe, every public utility shall file with the Commission . . . schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges. . . .

Under the analysis Winnetka presents, Comm Ed could not depart from its long-standing economy energy sales practices without formally notifying the Commission and receiving permission to do so. The Act requires a utility to provide the FERC with notice of a proposed tariff change at least thirty days in advance and empowers the Commission to suspend the effective date of the change for up to five months. 16 U.S.C. § 824d(d)–(e).[7]

---

5. Throughout these proceedings Comm Ed has asserted that adherence to its 1972–1979 economy energy sales terms would result in a net loss to the utility because the cost of supplying such energy under those conditions would exceed the price Winnetka would pay to purchase it. The Commission has taken no position on this aspect of the controversy, apparently because the record contains insufficient evidence to support a conclusion.

6. He did not mention Rochelle's protest that Comm Ed's unilateral alterations were discriminatory and anticompetitive.

7. The Commission has unreviewable discretion to determine whether to suspend a § 205(c) filing. *Municipal Light Bds. v. FPC*, 450 F.2d

Neither the statute nor its implementing regulations define "practice."[8] The Commission has defined the term as "[a] consistent and predictable course of conduct of the supplier that affects its financial relationship with the consumer." *Michigan Wisconsin Pipe Line Co.*, 34 F.P.C. 621, 626 (1965). In adopting this definition, the agency reasoned that the inclusion of standard practices or procedures in a tariff furthers the purpose underlying rate-filing requirements by announcing existing policies and explaining current services to present and potential customers. *Id.* However, the FERC does not rigidly insist that tariffs describe all routine utility practices. Instead, it purports to follow a "rule of reason," a case-by-case approach. *See Pacific Gas & Electric Co.*, 17 Fed. Power Serv. (MB) 5–996, 5–1005 (June 14, 1979), *petitions for review pending sub nom. Pacific Gas & Electric Co. v. FERC*, Nos. 79–1882 *et al.* (D.C.Cir. argued Apr. 28, 1982). Under this approach, the FERC tells us, it balances the benefits to consumers against the burdens upon utilities in determining when to require the filing of utility procedures, policies, or practices.

 A venerable principle of administrative law admonishes that an agency must set forth clearly the grounds for its decision. *See, e.g., SEC v. Chenery Corp.*, 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Trailways, Inc. v. ICC*, 673 F.2d 514, 518–19 (D.C.Cir.1982). The FERC has not heeded that admonition in this case. If the FERC determined that Comm Ed's 1972–1979 economy energy procedures were not "practices" within the meaning of section 205(c), it should explain why it reached that conclusion. Similarly, if the FERC believes its "rule of reason" exempts specific economy energy sale terms from inclusion in a utility's tariff, it should state why it arrived at such a decision. The Commission should also set out the reasoning that underlies its interpretation of Rate 78;[9] in conjunction therewith, it should clarify whether or why it concluded that Comm Ed's discretion to alter the conditions of availability for economy energy sales encompassed economic as well as operational considerations.[10] Further, the FERC might indicate why it left unanswered Comm Ed's offer to supplement the tariff to make more explicit its general policy as to the availability of economy energy. While individual commissioners expressed their personal views on some of these questions, the agency itself supplied little more than a result.[11]

---

1341, 1348–52 (D.C.Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972).

8. The analogous provision of the Natural Gas Act, 15 U.S.C. § 717c(c), which is "substantially identical" to § 205(c) of the Federal Power Act, *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 350–51, 353, 76 S.Ct. 368, 369–70, 371, 100 L.Ed. 388 (1956), also does not define "practice."

9. The tariff provision in question might be read simply as an authorization to the load dispatcher to respond to daily, temporary changes and needs, without addressing the procedures, practices, or policies governing the general availability of economy energy. On the other hand, the tariff might be construed as a grant of broad discretion to Comm Ed—limited perhaps only by restrictions against arbitrary, discriminatory, or anticompetitive conduct—to effect changes in economy energy availability at any decisionmaking level.

10. *See supra* note 5.

11. We do not address the claim of intervenor Rochelle that Comm Ed's actions regarding economy energy sales were anticompetitive because this claim is not properly before us. Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), precludes judicial review of a Commission order unless the aggrieved party first seeks rehearing on its objection before the FERC except when "there is reasonable ground for failure so to do." Rochelle did not seek rehearing, and Winnetka did not raise this contention in its rehearing application. Rochelle's suggestion that the filing of a rehearing petition would have been futile does not, on the record before us, constitute "reasonable ground for failure so to do." *Cf. Sam Rayburn Dam Elec. Coop. v. FPC*, 515 F.2d 998, 1005–09 (D.C.Cir. 1975) (addressing merits of electric cooperative's petition, although cooperative failed to seek rehearing of FPC order, since cooperative reasonably interpreted order as not applying to it until agency issued clarification after expiration of period for seeking rehearing), *cert. denied sub nom. Gulf States Utils. Co. v. FPC*, 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976). *See also Papago Tribal Util. Auth.*

■ Since we do not know the path the FERC is taking with respect to economy energy sales in general, or the reasons for the particular decision before us, we cannot intelligently review the FERC's order. *See United States v. Chicago, Milwaukee, St. Paul & Pacific R.*, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935). Accordingly, we vacate the Commission's order and remand this matter to the FERC for whatever additional proceedings it deems appropri-ate to the development of a reasoned decision in response to Winnetka's administrative complaint.

*So ordered.*

---

*v. FERC,* 610 F.2d 914, 916 & n.14 (D.C.Cir. 1979) (permitting judicial review of claims of intervenor when intervenor had com-plied with procedural requirements of 16 U.S.C. § 825*l*).