# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 17, 2006        Decided August 1, 2006

No. 05-1060

POINT PARK UNIVERSITY,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS
WORKERS OF AMERICA, LOCAL 38061,
INTERVENOR

---

Consolidated with
05-1081

---

On Petition for Review and
Cross-Application for Enforcement
of an Order of the National Labor Relations Board

---

*Arnold E. Perl* argued the cause and filed the briefs for petitioner.

*Edward A. Brill* argued the cause for *amici curiae* American Council on Education, et al. in support of petitioner. With him

on the brief was *Lawrence Lorber*.

*Daniel A. Blitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, Acting General Counsel at the time the brief was filed, *John H. Ferguson*, Assistant General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Meredith L. Jason*, Supervisory Attorney.

*James B. Coppess* argued the cause for intervenor. With him on the brief was *Joseph J. Pass*.

Before: SENTELLE, RANDOLPH and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In *NLRB v. Yeshiva University*, 444 U.S. 672 (1980), the Supreme Court first determined that faculty at colleges and universities may be managerial employees exempt from the protection of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 151 *et seq*. Since *Yeshiva*, the battle lines over organizing unions among faculty have been drawn with predictable arguments. College and university administrations typically argue that their faculties' involvement in academic affairs is extensive and managerial. Unions argue it is limited and circumscribed. And so it is here. Petitioner Point Park University (the "University" or "Point Park") argues that the Act bars its faculty from organizing a bargaining unit because they are managers. The union argues they are not. *Yeshiva* and our explanation of its application in *LeMoyne-Owen College v. NLRB*, 357 F.3d 55 (D.C. Cir. 2004), provide the National Labor Relations Board ("NLRB" or the "Board") guidance how to resolve this type of dispute. Because neither the Regional Director nor the Board

followed that guidance and thus failed to adequately explain why the faculty's role at the University is not managerial, we grant the University's petition for review, deny without prejudice the Board's cross-application for enforcement, and remand this case for further proceedings consistent with this opinion so that the Board can provide such an explanation or reconsider its conclusion.

## I.

Point Park University, located in Pittsburgh, Pennsylvania, has 3,200 students, 80 full-time faculty, and 560 employees. Founded in 1960 as Point Park College, it was chartered as a university in 2003 and renamed to reflect its new status. Students at the University pursue bachelors degrees in fifty majors and seven masters degrees through four schools: Arts and Sciences, Business, the Conservatory of Performing Arts, and the Adult and Professional Studies Program. Point Park's authority structure consists of a board of trustees, a president who also serves as a member of that board, a vice president of academic affairs who also serves as dean of the faculty, an associate vice president of academic affairs, deans of the four schools, department chairs, program directors, and the faculty.

In 2003, the Newspaper Guild of Pittsburgh/ Communications Workers of America, Local 38061, AFL-CIO (the "Union") filed a petition with the Board seeking to represent a bargaining unit of all full-time faculty at Point Park. The University contested the petition, arguing that all its full-time faculty members were managerial employees and that some of the full-time faculty were supervisors,[1] both barred by the Act

---

[1] Those included: (1) Robert O'Gara, Frederick Johnson, Martin Greenberg, and Walter Zalot, who were program directors; (2) the unfilled position of Director of the MBA program; (3) Robin

from organizing a union. The Regional Director of Region Six of the NLRB convened nineteen days of hearings between November 12, 2003 and January 16, 2004 to consider the Union's petition. The Regional Director concluded that the full-time faculty were eligible for union representation and that the University had failed to prove, under *Yeshiva*, that the faculty "exercise such plenary, absolute or effective authority or control to warrant their exclusion from the protection of the Act as managerial employees." The Regional Director also found that some faculty members were supervisors and thus barred by the Act from joining a union, while others were not.[2]

The University filed with the Board a timely request for review of the Regional Director's decision, *see* 29 C.F.R. § 102.67, arguing that the decision departed from established Board precedent and was clearly erroneous with respect to a number of facts not at issue here. The Board denied Point Park's request for review. After an election, the Union was certified as the exclusive collective bargaining representative. The University refused to recognize or bargain with the Union, and the Union filed an unfair labor practice charge in response. The Board's General Counsel issued a complaint against the

---

Walsh, Head of Graduate Studies; and (4) William Moushey, Executive Director of the Innocence Institute.

[2] The Regional Director found that "Robert O'Gara, Frederick Johnson, Walter Zalot and the Director of the MBA program are supervisors within the meaning of the Act" and not allowed to organize, but was "unable to determine on the record before [him] whether [Martin] Greenberg, a recently hired program director . . . possesses any managerial authority" and thus permitted "Greenberg to vote subject to challenge in the election." The Regional Director concluded that neither Robin Walsh nor William Moushey were supervisors or managerial employees. Petitioners do not dispute these findings and conclusions.

University, alleging that it had violated Sections 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5),[3] by "fail[ing] and refus[ing] to recognize and bargain with the Union." In defense of its conduct, Point Park challenged the Board's decision to certify the Union and asked the Board to reopen the record to consider additional, newly discovered evidence. The Board granted the General Counsel's motion for summary judgment, ordered Point Park to bargain with the Union, and refused to reopen the record.

Point Park filed a timely petition for review with this Court, and the Board filed a cross-application for enforcement of the Board's order. Point Park's petition brings "the entire NLRB proceeding—including the Regional Director's underlying decision to certify the full-time faculty as a bargaining unit—before this court for review." *LeMoyne-Owen*, 357 F.3d at 60 (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 477 (1964)).

## II.

The gravamen of Point Park's petition is that the Board erred in determining that the University's full-time faculty are not managerial employees under the Act and are thus entitled to form a union. We conclude that we are unable to review adequately the Board's decision because the Regional Director failed to follow our guidance in *LeMoyne-Owen* that he explain which factors he found "significant and which less so, and why" in determining, pursuant to *Yeshiva*, that Point Park's full-time

---

[3] Section 158(a) of Title 29, United States Code, provides that "[i]t shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [the Act]; [or] . . . (5) to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a).

faculty were not managerial employees. *See* 357 F.3d at 61.

**A.**

The Supreme Court set off a seismic shift in the law of labor relations in American higher education when it held in *Yeshiva* that, in some circumstances, faculty members, who for many years the Board had thought were protected by the National Labor Relations Act, might instead be barred by the Act from organizing a union.[4] The proper analysis, the Court held, turns on the type of control faculty exercise over academic affairs at an institution. A brief explanation of the history of the sometimes expanding, sometimes contracting protections of the Act by Congress and the Supreme Court will help explain why the correct application of *Yeshiva*'s analysis is so important to the proper resolution of this case.

As enacted in 1935, the National Labor Relations Act broadly authorized "any employee," excluding agricultural laborers and domestic servants, to organize a union. *See* National Labor Relations Act of 1935, Pub. L. No. 74-198, § 2(3), 49 Stat. 449, 450. The Supreme Court held that under this expansive language even supervisors enjoyed the protection of the Act. *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 489-90 (1947) ("we see no basis in this Act whatever for holding that foremen are forbidden the protection of the Act when they take collective action to protect their collective interests"). In quick response to the Supreme Court, Congress removed supervisors from the Act's protection, *see* Labor Management Relations (Taft-Hartley) Act of 1947, ch. 120, sec. 101, § 2(3), 61 Stat. 136, 137-38 (codified as amended at 29 U.S.C. § 152(3)) ("the term 'employee' . . . shall not include . . .

---

[4] *See* Marina Angel, *Professionals and Unionization*, 66 MINN. L. REV. 383, 447-455 (1982).

any individual employed as a supervisor"), but also explicitly included professional employees within the Act's reach, *see id.* §§ 2(12) (codified as amended at 29 U.S.C. § 152(12)), 9(b)(1) (codified as amended at 29 U.S.C. § 159(b)(1)) (authorizing professional employees to unionize where "a majority of such professional employees vote for inclusion in such unit"). From the time the Board first asserted jurisdiction over a university's faculty in 1971 until the Supreme Court decided *Yeshiva* in 1980, the Board considered faculty members at institutions of higher learning "professional employees" whose union activities were protected by the Act. *See C.W. Post Ctr. of Long Island Univ.*, 189 N.L.R.B. 904, 905 (1971).

In 1974, the Supreme Court recognized another exception to the Act when it held in *NLRB v. Bell Aerospace Co.* that "Congress intended to exclude from the protections of the Act all employees properly classified as 'managerial.'" 416 U.S. 267, 275 (1974). Although the Act did not contain an express statutory exclusion for management employees like what Congress had provided for supervisors, the Court reasoned that they were "regarded as so clearly outside the Act" by the Congress that first created the Act "that no specific exclusionary provision was thought necessary." *Id.* at 283. Managerial employees, who cannot form or join a union, were those who "formulate and effectuate management policies by expressing and making operative the decisions of their employer." *Id.* at 288 (quotation marks omitted). The key inquiry, the Court later explained, was whether employees were "aligned with management." *Yeshiva*, 444 U.S. at 683 (citing *Bell Aerospace*, 416 U.S. at 286-87).

Since *Bell Aerospace*, the Board's determinations in cases involving union petitions to organize have often turned on the distinction between professional employees, who may unionize,

and managerial employees, who may not.[5] Making that distinction requires the Board to conduct a fact-intensive inquiry into the specific responsibilities of employees. *See Salinas Newspapers,* 279 N.L.R.B. 1007, 1010 (1986) ("[t]he Supreme Court and the Board, in determining managerial status, weigh the facts elicited to determine whether or not the persons at issue are involved in the formulation, determination and effectuation of management policies") (quoting *Simplex Indus., Inc.*, 243 N.L.R.B. 111, 111 (1979)); *Curtis Noll Corp.*, 218 N.L.R.B. 1447, 1448 (1975) ("Whether or not a person is 'managerial' is to be determined on a case-by-case basis after close examination of the duties performed by the person in question while occupying a position alleged to be 'managerial.'").

Even after *Bell Aerospace,* the Board continued to find that full-time faculty at colleges and universities were professional, not managerial, employees. *See, e.g.*, *Goddard College*, 234 N.L.R.B. 1111, 1113 (1978) ("the discretion exercised by core faculty members, both individually and collectively, regarding such matters as student recruitment and admissions, completion of degree requirements, and curriculum, clearly is indicative of professional, rather than managerial status"); *Ne. Univ.*, 218 N.L.R.B. 247, 257 (1975) ("The existence of . . . 'shared

---

[5] *See, e.g.*, *Neighborhood Legal Servs., Inc.*, 236 N.L.R.B. 1269, 1273 (1978) ("professional employees plainly are not the same as management employees either by definition or in authority, and managerial authority is not vested in professional employees merely by virtue of their professional status, or because work performed in that status may have a bearing on company direction"); *Case Corp.*, 304 N.L.R.B. 939, 948 (1991) ("technical and professional employees plainly are not the same as managerial employees either by definition or in authority"); *General Dynamic Corp.*, 213 N.L.R.B. 851, 857 (1974) (distinguishing professional employees from managerial employees who occupy "executive-type positions [and] are closely aligned with management as true representatives of management").

authority' may well indicate that faculty members are 'professionals,' but it does not necessarily make them 'managerial.'").

As long as faculty were understood to be professional employees, which they clearly are, and not also managerial employees under *Bell Aerospace*, the task of the Board was relatively straightforward. *See id.* That all changed with *Yeshiva*, when the Supreme Court applied the definition of managerial employee in *Bell Aerospace* to faculty at a college or university and held for the first time that some faculty members, even though they are professional employees, may also be "managerial employees," barred by the Act from union activities. 444 U.S. at 691.

*Yeshiva* imposed significant demands upon the Board in determining whether faculty members are "managerial employees," holding that this mixed question of fact and law cannot be determined "on the basis of conclusory rationales rather than examination of the facts of each case." *Id.* In other words, context is everything. Every academic institution is different, and in determining whether a particular institution's faculty are "managerial employees" excluded from the Act or "professional employees" included in the Act, the Board must perform an exacting analysis of the particular institution and faculty at issue. That analysis must look beyond self-serving descriptions of the role of faculty or the administration of a university. In *Yeshiva*, the Court looked repeatedly to the actual role of the faculty in the academic affairs of the university.[6] The

---

[6] *See id.* at 676 ("Through these meetings and committees, the faculty at each school *effectively* determine its curriculum, grading system, admission and matriculation standards, academic calendars, and course schedules.") (emphasis added); *id.* at 686 ("They *effectively* decide which students will be admitted, retained, and graduated.")

key inquiry is "how a faculty is structured and *operates*." *Id*. at 690 n.31 (emphasis added). The Board's task under *Yeshiva* is made more difficult by the fact, frankly acknowledged by the Court in *Yeshiva*, that the Act is not easily applied to labor relations in the university setting:

> The Act was intended to accommodate the type of management-employee relations that prevail in the pyramidal hierarchies of private industry. In contrast, authority in the typical mature private university is divided between a central administration and one or more collegial bodies. . . . Although faculties have been subject to external control in the United States since colonial times, traditions of collegiality continue to play a significant role at many universities, including Yeshiva. For these reasons, the Board has recognized that principles developed for use in the industrial setting cannot be imposed blindly on the academic world.

*Id*. at 680-81 (internal citations, quotation marks, and footnote omitted). Thus, the Board must determine whether the faculty in question so controls the academic affairs of the school that their interests are aligned with those of the university or whether they occupy a role more like that of the professional employee in the "pyramidal hierarchies of private industries." *See id*. That is by its very nature a fact-bound inquiry.

The Court also noted that the core professional activities of faculty that are common at most colleges and universities—"determin[ing] the content of *their own* courses,

_____

(emphasis added); *id*. at 691 ("[T]he faculty of Yeshiva University, *in effect*, substantially and pervasively operat[e] the enterprise.") (citation omitted, quotation marks omitted, and emphasis added).

evaluat[ing] *their own* students, and supervis[ing] *their own* research"—are not enough, by themselves, to remove faculty from the protection of the Act. *Id*. at 690 n.31 (emphasis added). The Court determined, however, that the faculty at Yeshiva University were involved in activities far beyond the core professional activities of a typical faculty—activities that fit the *Bell Aerospace* definition of "managerial employees." As the Court explained:

> The controlling consideration in this case is that the faculty of Yeshiva University exercise authority which in any other context unquestionably would be managerial. Their authority in academic matters is absolute. They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school.

*Id.* at 686. This is the heart of the Court's decision in *Yeshiva*. The faculty's "authority" in the "academic matters" mentioned—the *Yeshiva* factors—has become the template for Board analysis of whether faculty are managerial employees. Specifically, the Board must consider the degree of faculty control over academic matters such as curriculum, course schedules, teaching methods, grading policies, matriculation standards, admission standards, size of the student body, tuition to be charged, and location of the school. *See, e.g.*, *Duquesne Univ.*, 261 N.L.R.B. 587, 589 (1982); *Loretto Heights College*, 264 N.L.R.B. 1107, 1119 (1982).

Like Point Park University, LeMoyne-Owen College sought

review of a Board decision that its faculty were not managerial employees and were thus entitled under the Act to organize a union. *See LeMoyne-Owen*, 357 F.3d at 61. The College had argued to the Regional Director and the Board that its faculty were indistinguishable from faculty the Board had held to be managerial employees in previous cases. In ruling against the College, neither the Regional Director nor the Board discussed these precedents.

We found such silence insufficient and remanded the case for the Board to provide a more fulsome explanation of its decision. Although an "agency is by no means required to distinguish every precedent cited to it by an aggrieved party," *id.* at 60, we held that where "a party makes a significant showing that analogous cases have been decided differently, the agency must do more than simply ignore that argument," *id*. at 61. We then stressed the need for a clear explanation by the Board when applying *Yeshiva*'s multi-factor test:

> The 'open-ended rough-and-tumble of factors' on which *Yeshiva* launched the Board and higher education can lead to predictability and intelligibility only to the extent the Board explains, in applying the test to varied fact situations, *which factors are significant and which less so, and why. . . .* In the absence of an explanation, the 'totality of the circumstances' can become simply a cloak for agency whim—or worse. . . . [The Board] may have an adequate explanation for the result it reached [but] we cannot . . . assume that such an explanation exists until we see it.

*Id*. (citation omitted and emphasis added). That is where we find fault with the Board's analysis here.

13

**B.**

Because Congress has delegated to the Board responsibility for determining the appropriate bargaining unit, *see* 29 U.S.C. § 159(b), we "accord deference to the Board's exercise of its authority." *LeMoyne-Owen*, 357 F.3d at 60. We cannot be deferential, however, where the Board fails to adequately explain its reasoning. *Id*. at 61. The Supreme Court has held that when the "Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *NLRB v. Metro. Life Ins. Co.,* 380 U.S. 438, 443 (1965) (citation omitted). We are, however, "indulgent toward administrative action to the extent of affirming an order where the agency's path can be 'discerned' even if the opinion 'leaves much to be desired.'" *WAIT Radio v. FCC*, 418 F.2d 1153, 1156 (D.C. Cir. 1969) (citation omitted); *see also Casino Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006). Without a clear presentation of the Board's reasoning, it is not possible for us to perform our assigned reviewing function and to discern the path taken by the Board in reaching its decision. *See Metro. Life Ins. Co.*, 380 U.S. at 443.

Nor can our Court fill in critical gaps in the Board's reasoning. We can only look to the Board's stated rationale. We cannot sustain its action on some other basis the Board did not mention. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196-97, 200 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.") This is not a new concern, but it is central to our performance of the limited role Congress has assigned us in reviewing agency action. *See id.*; *SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943); *Village of Winnetka, Ill. v. FERC*, 678 F.2d 354, 357 (D.C. Cir. 1982).

Here, both the Board and the Regional Director failed to do what *Yeshiva* and *LeMoyne-Owen* mandate: explain "which factors are significant and which less so, and why" in their determination that the faculty at Point Park were not "managerial employees." *See LeMoyne-Owen*, 357 F.3d at 61. Volume alone is insufficient. The Regional Director, whose findings and conclusions regarding the role of Point Park's full-time faculty the Board adopted with only limited discussion and no stated analysis, produced a 108-page decision with 59 pages of factual findings, and 16 pages of legal analysis that identified and relied upon a host of factors. Some findings suggest that the faculty are managerial employees, while others suggest they are not. In analyzing these findings, the Regional Director mentioned some of the academic factors relied upon by the Supreme Court in its managerial analysis in *Yeshiva*, including: (1) control over curriculum and course schedules; (2) control over teaching methods; (3) control over grading policies; and (4) control over which students will be admitted, retained, and graduated. In addition, the Regional Director referred to various non-academic factors that the Supreme Court listed in *Yeshiva* but which the Supreme Court described as "features of faculty authority" upon which it did not need to "rely primarily," 444 U.S. at 686 n.23: (1) control over hiring; (2) control over tenure; (3) control over sabbaticals; (4) control over terminations; and (5) control over promotions. Finally, the Regional Director touched upon several factors relied upon in previous Board decisions: (1) control over salary and benefits; (2) statements made by the Administration; and (3) the size of the University's administrative component.

Yet nowhere in his lengthy decision did the Regional Director state, as we held in *LeMoyne-Owen* that he must, which factors were "significant and which less so, and why." 357 F.3d at 61. While the Regional Director stated many of the *Yeshiva* factors, he failed to explain which factors he primarily relied

upon and his reasoning for doing so. Faced with this "open-ended rough-and-tumble of factors," we cannot assume that the Regional Director had an "adequate explanation for the result [he] reached . . . until we see it." *Id*. The closest the Regional Director came to providing such an explanation was his statement that Point Park's "faculty . . . undoubtedly has an important consultative role, but based on the record developed, it cannot be concluded that they exercise such plenary, absolute or effective authority or control to warrant their exclusion from the protection of the Act as managerial employees." This passing observation, stated in the form of a conclusion, does not substitute for the fact-specific analysis called for by *Yeshiva* and *LeMoyne-Owen*. The Board knows how to perform such an analysis, *see Duquesne University*, 261 N.L.R.B. at 589 ("In sum, it is evident from the record that the managerial authority possessed by the Duquesne law school faculty is nearly identical to that possessed by the faculty in *Yeshiva* in such critical academic matters as curriculum, grading systems, and admission and matriculation standards."), but certainly did not do so here.

Had the Regional Director, or the Board, stated with clarity which factors were significant to the outcome and why, we could have performed our review. Distinguishing between excluded managers and included professional employees is a fact-intensive inquiry that presents special challenges in the unique and often decentralized world of academia. *Yeshiva* identified the relevant factors that the Board must consider. *See* 444 U.S. at 691. *LeMoyne-Owen* held that the Board must clearly explain its analysis. *See* 357 F.3d at 61. The failure to provide such an explanation is grounds for remand to the Board, *see id.*, which we do here.

**C.**

One remaining issue requires our attention. In October 2003, Point Park served a subpoena on the faculty seeking a variety of books and records. One month later, in advance of the Regional Director's hearing, the Union responded on behalf of the faculty providing some, but not all, of the materials sought. The Union represented that it would make further determinations whether it possessed additional responsive materials. The Regional Director announced his decision in April 2004. In August and September 2004, the Union, responding to an unrelated request, produced documents, sought by the October 2003 subpoena, that had not previously been produced. On September 13, 2004, as part of its answer to the Board's complaint, Point Park asserted that the Board should reopen the hearings before the Regional Director to take additional evidence and supplement the record in light of this timely sought but late-produced material. Point Park repeated this request in its November 27, 2004, response to the motion for summary judgment.

On February 17, 2005, the Board denied Point Park's request, holding that Point Park failed to "act with reasonable diligence" by not (1) seeking to enforce its subpoena when the Union responded with a partial production and (2) moving to immediately reopen the hearing when it received the belated production in September 2004.

Point Park argues the "Board's failure to reopen and supplement the record was error." We review an agency's denial of a motion to reopen the record for abuse of discretion. *See Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1285 n.10 (D.C. Cir. 1999). An abuse of discretion occurs where the Board's "findings of fact are not supported by substantial evidence in the record considered as a whole." *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 961 (D.C. Cir. 2003)

(quotation marks and citation omitted). We "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Id.* at 962 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

The Board's findings are not "supported by substantial evidence on the record considered as a whole." *See* 29 U.S.C. § 160(f). The Board, in concluding that "a reasonably diligent party would have sought enforcement," did not address that the Union had, in fact, already informed Point Park that after it had made its initial production in response to the October 2003 subpoena, it would make a continuing determination whether it possessed any additional documents responsive to the subpoena. In addition, the Board, in concluding that Point Park had "waited over 2 months . . . to seek to reopen the record," ignored Point Park's September 13, 2004 request to do so. The Board does not explain why this request, made within weeks of the Union's belated production of the new evidence, does not constitute a timely request to reopen the record. Because the Board's decision did not "tak[e] into account contradictory evidence or evidence from which conflicting inferences could be drawn," *Universal Camera Corp.*, 340 U.S. at 487, its findings are not supported by substantial evidence.

## III.

For the foregoing reasons, we grant Point Park's petition for review, deny without prejudice the Board's cross-application for enforcement, and remand the case to the Board for proceedings consistent with this opinion.

*So ordered.*