Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 9, 2003        Decided February 10, 2004

No. 03-1031

LeMoyne-Owen College,
Petitioner

v.

National Labor Relations Board,
Respondent

Consolidated with
03–1099

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

*Arnold E. Perl* argued the cause and filed the briefs for petitioner.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Steven B. Goldstein*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Margaret A. Gaines*, Supervisory Attorney.

Before: GINSBURG, *Chief Judge*, and GARLAND and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROBERTS.

ROBERTS, *Circuit Judge*: Petitioner LeMoyne-Owen College is a historically black college in Memphis, Tennessee that traces its roots to a school founded in 1862. The College's full-time faculty (numbering approximately sixty members) sought to unionize in the spring of 2002 to negotiate with management, but the College argued that the faculty members *were* management — that is, managerial employees not entitled to the protection of the National Labor Relations Act (NLRA). *See* 29 U.S.C. §§ 152(3), 157 (defining covered employees and establishing the right of collective bargaining); *see also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 283 (1974) (managerial employees, though not specifically excluded from NLRA coverage, were "regarded as so clearly outside the Act that no specific exclusionary provision was thought necessary"). The National Labor Relations Board sided with the faculty, ordering the College to recognize and bargain with the faculty's representative. The College petitioned for review in this court, and the Board filed a cross-application to enforce its order.

1. The College relies primarily on *NLRB v. Yeshiva University*, 444 U.S. 672 (1980), the Supreme Court's leading (because only) case on determining the managerial status of an academic faculty. In *Yeshiva*, a union of the university's faculty sought certification to represent the faculty in collective bargaining with the administration. The NLRB granted the union's petition, but the Supreme Court held that the faculty were managerial employees and thus not covered by the NLRA. *Id.* at 691. The Court drew its definition of managerial employees from *Bell Aerospace*, which held that

managers are those who " 'formulate and effectuate management policies by expressing and making operative the decisions of their employer.' " 416 U.S. at 288 (quoting *Palace Laundry Dry Cleaning Corp.*, 75 N.L.R.B. 320, 323 n.4 (1947)). *See Yeshiva*, 444 U.S. at 682. The Court explained that the exception for "managerial employees," like the express statutory exception for "supervisors," derived from a recognition "[t]hat an employer is entitled to the undivided loyalty of its representatives." *Id.*

Recognizing that the governance structures of academic institutions differ from the standard industry model for which the NLRA was designed, *id.* at 680, the Court declined to adopt a *per se* rule on the managerial status of faculty members, *id.* at 690–91 n.31. Instead, the Court emphasized a number of factors that supported its conclusion that Yeshiva University's faculty were beyond the scope of the NLRA:

> The controlling consideration in this case is that the faculty . . . exercise authority which in any other context unquestionably would be managerial. Their authority in academic matters is absolute. They decide what courses will be offered, when they will be scheduled, and to whom they will be taught. They debate and determine teaching methods, grading policies, and matriculation standards. They effectively decide which students will be admitted, retained, and graduated. On occasion their views have determined the size of the student body, the tuition to be charged, and the location of a school.

*Id.* at 686.

The Court explained that, in a university such as Yeshiva,

> the predominant policy normally is to operate a quality institution of higher learning that will accomplish broadly defined educational goals within the limits of its financial resources. The "business" of a university is education, and its vitality ultimately must depend on academic policies that largely are formulated and generally are implemented by faculty governance decisions.

*Id.* at 688. The Court rejected the suggestion that the faculty's role was merely advisory because some of its decisions could be overturned by the university administration or board of trustees. "[T]he fact that the administration holds a rarely exercised veto power does not diminish the faculty's effective power in decisionmaking and implementation," the Court found; "the relevant consideration is effective recommendation or control rather than final authority." *Id.* at 683 n.17; *see id.* at 688 n.27 (discussing "occasional vetoes of faculty action").

2. As might be expected given such a long list of relevant factors and the exquisite variety of academic institutions across the country, the Board has developed a substantial body of cases that explicate and develop the *Yeshiva* standard. In *American International College*, 282 N.L.R.B. 189 (1986), for example, the Board held the approximately ninety faculty members to be managerial employees, noting the authority of faculty standing committees in such areas as admissions, curriculum issues, and graduation requirements. *Id.* at 190–202. Although there were some instances in which the administration had vetoed faculty proposals, the NLRB said that "they are not substantial or predominant and do not show a pattern of unilateral action by the administration." *Id.* at 202.

In *Livingstone College*, 286 N.L.R.B. 1308 (1987), the NLRB reached the same outcome, even though the faculty exercised their authority through standing committees of mixed membership — including administrators and students. *Id.* at 1310. The faculty's "substantial authority" in the development and implementation of policies in the academic sphere, *id.* at 1314, outweighed the lack of faculty input into budget decisions or the tenure process. *Id.* ("[W]e do not believe that lack of participation in [budgeting, tenure decisions, or setting tuition] precludes a finding that the faculty are managerial employees.").

The Board again found faculty members to be managerial employees in *Lewis and Clark College*, 300 N.L.R.B. 155 (1990). Faculty workload policies at the college were set by

the administration, but committees (composed predominantly of faculty) made effective recommendations in areas such as admissions requirements and curriculum. *Id.* at 156–57. The Board rejected a Regional Director's view that "umbrella committees" on which the faculty were a minority, addressing financial issues and long-term planning, negated the faculty's managerial status. As the Board found, "[t]here is . . . nothing inconsistent with the faculty members' having authority over one level of policy (e.g., academics), and the administration (including the board of trustees), having control over another (e.g., financial viability and long-term planning)." *Id.* at 162. The Board further explained:

> The board of trustees and others in the administration are entrusted with the ultimate policy-making and fiduciary responsibility for the College, not the faculty. But, even as to those areas in which the administration has exercised its own managerial decision-making authority, high-level implementation of those decisions is performed by the faculty.

*Id.*

In *Elmira College*, 309 N.L.R.B. 842 (1992), the Board upheld, without comment, a Regional Director's conclusion that "[w]ithout more, the nature of faculty involvement with respect to academic matters conclusively establishes their status as managerial employees." *Id.*, app. at 849 (Regional Director decision). Under the college by-laws, the faculty had authority over admissions, courses, graduation requirements, the nature of available degrees, and related procedural matters. *Id.* at 842. The Regional Director noted that some factors supported a lack of managerial status: "the college faculty does not participate in promotion decisions exclusive of tenure and, in a few instances, has been overruled in hiring decisions. Also, the faculty has only a limited voice in administrative decisions involving salary or benefits or the budget process." *Id.* at 850. He did not find these factors controlling, because they "fall outside the crucial matters of academic governance considered dispositive by the Supreme Court in *Yeshiva*." *Id.*

3. When the faculty of LeMoyne-Owen College petitioned the NLRB for recognition as a bargaining unit, the College responded by contending that "[t]he instant case bears strong similarity to cases in which the Board, utilizing the principles set forth in *Yeshiva*, found that faculty members were managerial employees . . . ." Employer's Br. to Regional Dir. at 16 (citing, *inter alia*, *American International College*, *Livingstone College*, and *Elmira College*). The College pointed to significant factual parallels between LeMoyne-Owen and the other institutions at which faculty members were deemed managerial employees — particularly when the comparison focuses primarily on academic matters and on "effective recommendation or control rather than final authority." *Yeshiva*, 444 U.S. at 683 n.17. For example, the LeMoyne-Owen faculty have, according to the *Faculty Handbook*, "policy and procedural authority" over a range of academic areas, including admissions standards, the curriculum, general education requirements, graduation requirements, standards for grading, candidates for graduation, and conditions of academic standing, suspension, and dismissal. *Faculty Handbook* § 3.00.

The faculty act largely through a Faculty Assembly, consisting of all full-time faculty members, and various standing committees. *Id.* The standing committees include a Curriculum Committee, which approves curriculum changes and course additions or modifications, and an Academic Honors, Standards, and Selection Committee, which oversees the awarding of academic honors and handles cases of academic probation and dismissal. *See id.* § 3.06 (curriculum committee); *id.* § 3.05 (academic honors committee). Faculty have discretion over their teaching methods and the content of their courses, within certain parameters described in the *Faculty Handbook*. For example, each full-time faculty member is obliged to teach twelve credit hours per semester, and for each course, the faculty member must prepare a detailed syllabus and file it with the appropriate division chair. *Id.* §§ 9.01, 10.01. College policy mandates that an

evaluation of each student's English usage form at least ten percent of the student's grade. *Id.* § 10.06.

Faculty recommendations on academic policies and other matters, such as tenure, often require the approval of the president and ultimately of the College's board of trustees. But the president testified that he had never, in six years as president, failed to approve a faculty recommendation on degree requirements or other matters related to the courses taught at the College. Hearing Transcript 338. He also stated that he had forwarded all Faculty Assembly recommendations on curricular changes to the trustees, without exception, and that the trustees had never rejected any of those recommendations. *Id.* at 339–40.

4. The Regional Director determined, however, that the faculty at LeMoyne-Owen were not managerial employees, and certified a bargaining unit consisting of all full-time faculty members. Decision and Direction of Election, NLRB Case No. 25-RC-10120 (Aug. 6, 2002), at 2–3 (Certification Decision). The Regional Director distinguished the College's faculty from the faculty at Yeshiva University, stating that "the faculty of LeMoyne-Owen College neither possess absolute control over any facet of the school's operations, nor 'effectively' recommend policies affecting its administration. They neither establish new policy nor effectively recommend changes to existing policy." *Id.* at 11. In support of this conclusion, the Regional Director noted that committee recommendations at the College are "subject to multiple levels of review, and subject to change by higher levels of authority." *Id.* The existence of such multiple levels of authority, he stated, makes it less likely that faculty recommendations will be effective, because the recommendations can be altered on their way up the hierarchy. *Id.* at 12. The Regional Director pointed to a number of other factors, including the presence of non-faculty on standing committees, an ad hoc core curriculum committee with significant non-faculty representation established by the president in apparent tension with the faculty Curriculum Committee, and the instructional policies in the *Faculty Handbook*, such as the English usage requirement and the rules governing course syllabi. *Id.* at

12–13. He also stated that the faculty play "a limited role in the selection of applicants for hire, [and] no role in the decision to dismiss staff or faculty," and cited specific instances such as the firing of secretaries during a financial crunch at the College in 2000 and the hiring of a professor as a full-time faculty member despite a faculty recommendation that she be hired only as a visiting professor. *Id.*

In reaching his determination, the Regional Director did not discuss any of the cases the College had cited. Instead, he relied primarily on *Florida Memorial College*, 263 N.L.R.B. 1248 (1982); *Kendall School of Design*, 279 N.L.R.B. 281 (1986); and *University of Great Falls*, 325 N.L.R.B. 83 (1997). *See* Certification Decision at 12, 14. Each of these post-*Yeshiva* cases held that an academic institution's faculty were not managerial employees. The College, however, contends that the facts of these cases are distinguishable in significant respects from the facts in the LeMoyne-Owen record. There was no tenure system at Florida Memorial College, and teaching contracts were generally only for a single year. Nor was there evidence of any effective faculty input into the college's curriculum; faculty members seeking to introduce new courses had to seek approval directly from the president and the dean of academic affairs. 263 N.L.R.B. at 1249–51. The school had an open admissions policy (precluding a faculty role in admission standards), and the administration established continuation requirements and approved students for graduation. *Id.* at 1250. Noting that the administration had "systematically and independently reviewed" faculty proposals and "consistently substituted its own judgment for that of the faculty," the Board found that the faculty's authority did not satisfy the *Yeshiva* standard. *Id.* at 1254.

At the Kendall School of Design, meetings of the full faculty were held only twice per semester, and votes of the full faculty were never taken; a refocusing of the school's curriculum took place under the direction of the academic dean, who gave the faculty curriculum committee only the broad outlines of the revisions and then demanded a simple

up-or-down vote. 279 N.L.R.B. 281, app. at 283, 286 (Regional Director decision). Faculty members played no role in other academic matters such as matriculation standards and graduation requirements. *Id.* at 286. *University of Great Falls* involved an institution where the dean of faculty had on several occasions refused to let faculty use the textbooks of their choice, and the deans — not the faculty — were responsible for approving students for graduation. 325 N.L.R.B. 83, app. at 85 (Regional Director decision). In addition, the Board found that, unlike in *Elmira College* and *Lewis and Clark College*, there was no "clear evidence that faculty recommendations were generally followed." 325 N.L.R.B. at 83 & n.8.

LeMoyne-Owen requested that the Board review the Regional Director's decision, challenging the Regional Director's reliance on these cases and renewing its argument that other cases, such as *American International College* and *Lewis and Clark College*, were controlling precedent. *See* Employer's Request for Review of Bargaining Unit Certification at 10–12, 17–21. The Board denied the request by a 2–1 vote, declaring in a one-sentence order that the College had "raised no substantial issues warranting review." Order, NLRB Case No. 25-RC-10120 (Sept. 4, 2002). After the faculty voted to accept their bargaining representative, the Regional Director issued a formal certification of that representative and the College again sought the review of the Board. As it had before, the College argued that the LeMoyne-Owen faculty exercise authority comparable to that of the faculty members in *American International College* and the analogous post-*Yeshiva* cases. *See* Employer's Request for Review of Regional Director's Supplemental Decision and Certification of Representative at 12–15. The Board again issued a terse order denying review, again with no discussion of the precedents. Order, NLRB Case No. 26-RC-8328 (Oct. 11, 2002). The College refused to bargain with the faculty, and the Board ultimately deemed the College guilty of unfair labor practices and ordered it to bargain. Decision and Order, NLRB Case No. 26-CA-20953, at 2 (Jan. 17, 2003). The matter is before this court on the College's petition for review

of the order and the Board's cross-application for enforcement. The College's challenge brings the entire NLRB proceeding — including the Regional Director's underlying decision to certify the full-time faculty as a bargaining unit — before this court for review. *Boire v. Greyhound Corp.*, 376 U.S. 473, 477 (1964); *Terrace Gardens Plaza, Inc. v. NLRB*, 91 F.3d 222, 225 (D.C. Cir. 1996).

5. We accord deference to the Board's exercise of its authority under 29 U.S.C. § 159 to certify appropriate bargaining units. *See, e.g.*, *BB&L, Inc. v. NLRB*, 52 F.3d 366, 369 (D.C. Cir. 1995). That deference is subject to certain limits, however, and one of those limits is that the Board "cannot ignore its own relevant precedent but must explain why it is not controlling." *Id.* (citing *Cleveland Constr. Co. v. NLRB*, 44 F.3d 1010, 1016 (D.C. Cir. 1995)); *see also International Union of Operating Eng'rs v. NLRB*, 294 F.3d 186, 188 (D.C. Cir. 2002) ("The Board has an obligation to engage in reasoned decisionmaking, which . . . requires it to give a reasoned explanation when it departs from its own precedent.") (citations omitted). In this case, the Board has not provided any explanation — let alone an adequate one — of how its disposition is consistent with its contrary holdings in the post-*Yeshiva* cases that appear to have presented similar facts. The only opinion is that of the Regional Director, which did not discuss or even mention a single one of the precedents on which the College relied.

An agency is by no means required to distinguish every precedent cited to it by an aggrieved party. *See Bush-Quayle '92 Primary Comm., Inc. v. Federal Election Comm'n*, 104 F.3d 448, 454 (D.C. Cir. 1997) ("We may permit agency action to stand without elaborate explanation where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears."); *Hall v. McLaughlin*, 864 F.2d 868, 873 (D.C. Cir. 1989) ("if the court itself finds the past decisions to involve materially different situations, the agency's burden of explanation about any alleged 'departures' is considerably less"). But where, as here, a party makes a significant showing that analogous

cases have been decided differently, the agency must do more than simply ignore that argument. *See Speedrack Prods. Group, Ltd. v. NLRB*, 114 F.3d 1276, 1279 (D.C. Cir. 1997) (Board "ignored its own precedent without offering any explanation as to why this precedent was inapplicable"). As this court noted in *Cleveland Construction*, 44 F.3d at 1016, "we cannot uphold silence." Emerson's advice to preachers — "emphasize your choice by utter ignoring of all that you reject," RALPH WALDO EMERSON, *The Preacher, reprinted in* 10 LECTURES AND BIOGRAPHICAL SKETCHES 215, 235 (1904) — will not do for administrative agencies.

The need for an explanation is particularly acute when an agency is applying a multi-factor test through case-by-case adjudication. The "open-ended rough-and-tumble of factors" on which *Yeshiva* launched the Board and higher education, *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 547 (1995); *see Yeshiva*, 444 U.S. at 690 n.31 (Court's analysis "is a starting point only, and . . . other factors not present here may enter into the analysis in other contexts"), can lead to predictability and intelligibility only to the extent the Board explains, in applying the test to varied fact situations, which factors are significant and which less so, and why. As the Second Circuit explained in *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995), "thorough, careful, and consistent application" of a multi-factor test is important to allow "relevant distinctions between different factual configurations [to] emerge," and because "appellate courts depend on it for the performance of their assigned task of review." In the absence of an explanation, the "totality of the circumstances" can become simply a cloak for agency whim — or worse. *See* HENRY J. FRIENDLY, BENCHMARKS 104 (1967) ("Lack of definite standards creates a void into which attempts to influence are bound to rush; legal vacuums are quite like physical ones in that respect.").

A court reviewing an *ipse dixit* outcome that seems inconsistent with proferred precedent is left to attempt to discern for itself which factual differences might have been determinative, without guidance from the agency, and to assess whether making such distinctions controlling is rational or

arbitrary, again without any agency explanation of why particular factors make a difference. The court really has no way of knowing if the rationale it discerns is in fact that of the agency, or one of the court's own devise. Yet only the former can provide a legitimate basis for sustaining agency action. *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943). Requiring an adequate explanation of apparent departures from precedent thus not only serves the purpose of ensuring like treatment under like circumstances, but also facilitates judicial review of agency action in a manner that protects the agency's predominant role in applying the authority delegated to it by Congress.

The NLRB may have an adequate explanation for the result it reached in this case. We cannot, however, assume that such an explanation exists until we see it. We therefore grant the petition for review, deny the cross-application for enforcement, and remand to the NLRB for further proceedings.